**11 So.2d 540**

**In re WILLIAMS.**

**No. 33213.**

**Nov. 4, 1942.**

**Rehearing Denied Dec. 30, 1942.**

Charles A. McCoy, of Lake Charles, Hollingsworth B. Barret, of Shreveport, and Frank Wm. Hart and B. Y. Wolf, both of New Orleans, for Committee on Professional Ethics and Grievances.

Ben F. Roberts, of Shreveport, Robert H. Wimberly, of Arcadia, and Guy Wimberly, of Shreveport, for R. LeRoy Williams.

ODOM, Justice.

This is a proceeding to disbar R. LeRoy Williams, an attorney-at-law, of Arcadia, Bienville Parish. It was brought by the

Committee on Professional Ethics and Grievances appointed by this court.

The Committee alleged that since his admission to the bar the defendant Williams has demeaned himself in a manner inconsistent and at variance with the oath subscribed by him as an attorney-at-law and has disregarded the ethical duties and obligations of a lawyer which he assumed as a member of the bar, and that, by reason of his misconduct as an attorney-at-law and an officer of this court, he should be disbarred.

The case is now before the court on exceptions to the report of the Commissioner. Counsel for defendant says in his brief:

"On the whole, the report of the Commissioner gives a fair statement of the facts involved.

"The exception is levelled not so much at the findings of fact, but rather at the conclusions reached by the Commissioner."

The Commissioner, after stating the pertinent facts disclosed by the evidence, said:

"Although his conscious wish throughout has been to see this case wind up happily for the defendant, your commissioner is forced to conclude that defendant violated his trust and that his conduct was not the proper conduct of a lawyer toward his clients, and especially toward clients as densely ignorant as John [Will] Lathan's heirs were. It is not your commissioner's impression that he is called on or even permitted to suggest that a penalty be imposed or not imposed. Your commissioner sees his duties ended when he has thus presented to the Court his findings and con-

·clusions, but he begs that the Court indulge him to the extent that he be permitted to say if the Court deems it fit and proper that a penalty be imposed, then, in view of all of the circumstances, your commissioner believes a penalty less than complete disbarment might be sufficient to bring the defendant to a better realization of his responsibilities and duties."

The Commissioner's report is full and complete, and shows that he has diligently and faithfully performed the difficult and perhaps unpleasant duties imposed upon him by this court. He has expended considerable time and labor in getting the evidence, as shown by the record, and in preparing his report. He has stated at length and with clearness and precision his findings of fact and his conclusions.

■ According to the facts found and stated by him, which findings and statement are conceded to be fair by the defendant, we think defendant has been guilty of misconduct in his capacity as an attorney-at-law—such misconduct as this court cannot and will not countenance or tolerate. He has been unfaithful in his duties toward his clients and has violated the trust and confidence reposed in him by this court as an attorney-at-law and as an officer of the court. And, as was said in the case of In re Heard, 174 La. 563, 141 So. 60, 67:

"Where an attorney violates the confidence reposed in him by the court and his duty towards his client, the court must inflict upon him a penalty commensurate with his wrong. The dignity of the court, the integrity of the profession, the protection of .clients, and the public good alike demand this."

We concur in the conclusion reached by the Commissioner that punishment commensurate with defendant's wrong should be inflicted upon him.

■ The pertinent facts are these: Will Lathan, a World War veteran, died intestate in the Parish of Bienville, leaving neither ascendants nor descendants, but certain collateral heirs. He held at the time of his death a war-risk insurance policy issued by the United States government. It seems that this policy of insurance fell into the hands of the deceased's aunt, Julia Lathan, who thought she was entitled to the entire proceeds thereof for the reason that she had reared and cared for Will Lathan from the time he was two years old. The Veterans' Bureau declined to pay the proceeds of the policy to Julia Lathan and suggested that an administrator for the estate be appointed to whom the proceeds might be paid. Thereupon, Julia Lathan employed the defendant, R. LeRoy Williams, to present her application to the court for appointment as administratrix of the succession of the deceased.

The defendant Williams prepared and presented to the court on June 29, 1931, Julia Lathan's application to, be appointed administratrix of the succession, and in due course she was appointed by the court, took the oath, and gave bond as such.

According to the inventory filed, the only property belonging to the succession was "An award in the sum of $5,260.00 on an insurance policy due by the United States

Government", which was appraised at $5,-260.

In due course Julia Lathan, the administratrix, filed a final account. She charged herself as administratrix with the proceeds of the war-risk insurance policy, amounting to $5,260, and credited herself with certain items, such as the premium on her bond, court costs, bill for advertising, her fee as administratrix amounting to $131.49, and attorney's fees due R. LeRoy Williams amounting to $264. She showed a balance left in her hands, after paying the above costs and charges, amounting to $4,800.17.

Thereafter, and while the balance of the proceeds of the policy were still in the hands of Julia Lathan, administratrix, Julia Lathan, Della Mason, Oliver Underwood, and Abe Radden employed the defendant to have them recognized as the sole heirs of the deceased Will Lathan. The defendant prepared a petition and presented it to the court on June 2, 1932, in which it was alleged that Julia Lathan and Della Mason were aunts, and Oliver Underwood and Abe Radden uncles, of the deceased, and that they were his sole heirs. In due course they were recognized as the sole heirs and sent into possession, each being entitled to receive one-fourth thereof. The court ordered that the administratrix pay the balance left in her hands to the heirs, as follows:

| To Oliver Underwood | $1200.29 |
| To Abe Radden | 1200.29 |
| To Della Mason | 1200.29 |
| To Julia Lathan | 1200.30 |

This judgment was signed on July 20, 1932, and on July 29 Julia Lathan, the administratrix, issued four checks—one to Oliver Underwood, one to Abe Radden, and one to Della Mason, each of these three being for $1,200.29, and one to herself for $1,331.79. Presumably, this check to Julia Lathan was intended to include the amount which she was to receive from the estate and the fees due her as administratrix. The purpose of drawing these checks was to pay each of the heirs his or her share of the estate, as directed by the court.

These checks were admittedly made out by the defendant and were signed as follows:

"Julia Lathan, Admx. Suc. Will Lathan, Dec'd.

"By R. L. Williams, Atty."

Julia Lathan, Della Mason, Oliver Underwood, and Abe Radden were impecunious, uneducated colored people. None could read or write, even to the extent of writing his or her name. Defendant was attorney for each of them. He represented Julia Lathan in her application to be appointed administratrix of the succession, and, as attorney, represented her and each of the others in their application to be recognized as heirs and sent into possession. He knew that none of them could read or write. Instead of sending for these heirs, in whose favor the checks were drawn, and having them endorse the checks in his presence or in the presence of the president or cashier of the bank on which the checks were drawn, defendant gave the checks to a Negro boy by the name of John Lathan, instructed him to carry them to the payees.

and have them endorse and return them to him, the defendant. He told John Lathan that the payees could not write their names and that therefore it would be necessary for them to endorse the checks by making their marks, and that their marks should be witnessed by someone who could write. John Lathan. did as instructed. After the payees endorsed the checks by making their marks, John Lathan brought the checks back, and he and the defendant went to the First National Bank, on which the checks were drawn, and in the presence of the defendant and Lathan the checks were cashed. As to what was done with the proceeds, we quote from the Commissioner's report, as follows:

"On receipt of the endorsed checks from the heirs, the defendant caused or directed deposits to be made from their proceeds and from the balance in the account of the administratrix, in the First National Bank, Arcadia, as follows:

| | |
|---|---|
| "Oliver Underwood | $ 500.00 |
| "Abe Radden | 500.00 |
| "Della Mason | 500.00 |
| "Julia Lathan | 600.00 |
| "Mrs. Hazel Williams, wife of defendant | 2,000.00 |
| "R. L. Williams, defendant | 1,095.83" |

As we have stated, the defendant represented each of the heirs as attorney. As shown by the Commissioner's report, instead of directing that the full amount of the checks be deposited to the credit of the respective heirs, he directed that only $500 be deposited to the credit of Oliver Underwood, Abe Radden, and Della Mason, and only $600 to the credit of Julia Lathan.

This left a balance of $3,095.83, and of this amount he directed that $2,000 be deposited to the credit of his wife, Mrs. Hazel Williams, and the balance, $1,095.83, to his personal account.

We here quote the following extract from the Commissioner's report:

"In testifying the defendant admitted that he disposed of the funds of the succession substantially as above set out, but he claimed that the amounts deposited to his credit and to that of his wife were held by him for the account of Julia Lathan at her direction; that each of the other three heirs had agreed that Julia should have all of his part except $500.00; that Julia wanted the defendant to hold for her all of the money coming to her except $600.00; that she was unable to keep money and would call for her balance when and as she needed it.

"Abe Radden emphatically denied that he knowingly consented to give up all of his $1,200.00 to Julia except $500.00 and the defendant testified in this respect that he was told that Abe had said whatever the others did would be all right with him. Della Mason, who died prior to the date of hearing in this case, swore on trial of a certain rule in the Lathan Succession which will be referred to below, that she did not give such consent and it appears that the first intimation any of the heirs, with the possible exception of Julia, had that they were legally entitled to more than had been deposited for them was when a mistaken or possibly fraudulent claim was made against the Succession of Will Lathan and an attorney investigating the matter

mentioned the amounts the record showed they had received."

About two weeks after the checks were cashed and the amounts deposited as shown above, a Negro woman by the name of Mary Hart went to the office of an attorney in Arcadia and told the attorney that she was one of Will Lathan's heirs and as such was entitled to a share in his succession. Apparently, in order to find out whether Mary Hart was an heir as she claimed, the attorney had Julia Lathan, Della Mason, Oliver Underwood, and Abe Radden come to his office together. They all came as requested, and, while talking with them, the attorney mentioned the fact that, according to the records, each of them had received the sum of $1,200. The attorney testified that each expressed great surprise and stated positively that he had received only $500 instead of $1,200. Thereupon Oliver Underwood, Abe Radden, and Della Mason employed this attorney to represent them in a proceeding to recover the balance due them. The attorney proceeded by rule, in which the heirs asked for the annulment of the judgment approving the final account of the administratrix; that Julia Lathan, individually and as administratrix, be ordered to return into the bank the amount of money shown by the account to be in her hands, and that judgment be rendered against Julia Lathan as administratrix for $1,200.04 for each of the plaintiffs, and that the clerk of court and the bonding company, surety on the administratrix's bond, be made parties and required to file all checks and vouchers in court before the bond was cancelled, and that the clerk of

court be prohibited from cancelling the bond.

The defendant and another attorney represented Julia Lathan, the administratrix, in that proceeding. Speaking of that proceeding and the answer which defendant filed for Julia Lathan, the administratrix, the Commissioner says in his report:

"Although he admitted in his testimony before commissioner that he handled the money of the Lathan Succession about as above set out and gave what he apparently considers sufficient explanation for such handling, in a rule filed by the other heirs or their representatives in the Lathan Succession attempting to obtain the balance of their succession funds from Julia, the defendant signed as one of the attorneys and verified Julia Lathan's answer in which he alleged in her behalf that the plaintiffs had received checks for the amounts due them under judgment of the Court (that is about $1,200.00 each); that said checks were endorsed and cashed by said plaintiffs and that they received the money therefor and caused said money to be disposed of as they saw fit, converting it to their own use. This answer further alleged the rule which was being answered to be 'wanton and malicious'. Testimony was offered to prove that the defendant did not draw up or read this answer before signing it, but while your commissioner is disposed to accept as a fact that it was not drawn by the defendant, it is difficult to understand how it could have been composed by another without his assistance, in view of its allegations and of the fact that it was signed and sworn to by him."

. The suit by these heirs against Julia Lathan, administratrix, was brought to this court on appeal and was decided November 27, 1933. Succession of Lathan, 178 La. 571, 152 So. 128, 129.

The case was decided in this court against the heirs on the ground that Julia Lathan, the administratrix, had paid out the amount which came into her hands as administratrix in accordance with the provisions of a judgment of court, and in this connection we said:

"If their money was disposed of contrary to their authority, plaintiffs' claim is against the person or persons making such unauthorized disposition and not against the administratrix and the surety on her bond."

In the latter part of 1934, something like a year after the decree of this court became final, the defendant settled with the heirs in full. The defendant testified that he made this settlement at the request of Julia Lathan, for whose benefit he says he withheld the money which was deposited in the bank to the credit of his wife and himself.

His counsel says that, because he made this settlement, he should be completely exonerated. We cannot concur in this view for several reasons. In the first place, the circumstances indicate that the settlement was made under pressure. When it was made, the heirs were represented by attorneys, who were familiar with the ruling of this court wherein we said, speaking of the heirs, that, if their money was disposed of contrary to their authority, "plaintiffs' claim is against the person or persons making

such unauthorized disposition and not against the administratrix and the surety on her bond". It clearly appears that this defendant was largely responsible for the making of the unauthorized disposition of the succession funds, because, as said by the Commissioner, the defendant caused or directed deposits to be made to the credit of the heirs in amounts less than one-half of those which the court had directed that they should receive, and that he withheld from them, and had deposited to the credit of his wife and himself, the remainder of the funds, $3,095.83, claiming that he was doing so for the benefit of Julia Lathan. When the defendant made final settlement with the heirs, they were represented by attorneys, this being shown by the receipt which the heirs signed, which receipt was signed by attorneys for some of the heirs and was also signed by them as witnesses.

Under the circumstances, it was clearly to the interest of the defendant to make a settlement with the heirs. It is quite obvious that the heirs, with the assistance of their attorneys, were in position to bring about conditions which would have been, to say the least, highly embarrassing to the defendant if he had refused to settle. The circumstances under which this settlement was made render it somewhat doubtful, to say the least, that it was voluntarily made.

In the second place, it was misconduct for the defendant to direct that the proceeds of the checks made out and delivered to the heirs be disbursed in a manner contrary to the orders of the court. The defendant represented each one of the heirs as attorney. It was his duty to see that his clients received what was justly due

them. They were illiterate colored people, who, while they did know that they had been recognized as heirs of the deceased Will Lathan, yet did not know what amount they were to receive as such heirs. They were wholly unable to protect themselves and naturally looked to the defendant to represent them properly. He withheld from them information to which they were entitled and which, as their counsel, he should have given them. While defendant says he was told by some of the heirs that Julia Lathan might have all their share of the succession except $500 each, he frankly admits that one of the heirs, Abe Radden, made no such statement to him personally but that one of the others told him he did. There is testimony in the record which supports the conclusion that these heirs had stated that they wanted Julia Lathan to have more than they, and, as a matter of fact, there was deposited in the bank to her credit $100 more than was deposited to the credit of any of the others. But each of the heirs emphatically denied that he authorized the deposits to be made in the manner shown by the record. Defendant was not justified in his conclusion, which he says was based partly on hearsay, that any of the heirs intended to donate the major portion of the inheritance to Julia Lathan.

Furthermore, we concur in the view expressed by the Commissioner that, while the testimony shows that the defendant did not himself prepare the answer to the rule filed by the heirs in the suit hereinabove referred to, "it is difficult to understand how it could have been composed by another without his assistance, in view of its allegations and of the fact that it was signed and sworn to by him".

Finally, if, as claimed by the defendant, he withheld $3,095.83 for the benefit of one of his clients, Julia Lathan, it was his duty to hold her money as a trust fund, separate and apart from his own. Instead, he had $2,000 of this money deposited to the credit of his wife and the remainder credited to his personal account.

The Commissioner states in his report that it was proved to his satisfaction that at all times the defendant had on hand funds sufficient to pay the claims of these heirs or to pay Julia Lathan, if it be conceded that she was entitled to the funds. But the fact that he had on hand sufficient funds for that purpose does not absolve him from the duty of keeping such funds segregated from his own account.

Numerous witnesses, among whom were two district judges before whose courts the defendant had practiced for many years, testified that defendant bore, and has always borne, a most excellent reputation as a lawyer. If he had ever been guilty of misconduct as a lawyer on any other occasion, no one was brought forward to say so. We must therefore assume that this was his first and only misstep.

The Committee charged that the defendant had appropriated to his own use and benefit certain funds of his clients. The Committee failed to make proof of that charge, but it was proved to the satisfaction of the Commissioner and to our satisfaction that the defendant, in his capacity as an attorney, was guilty of misconduct, and that he should be punished therefor.

We are informed that defendant is above 60 years of age. In view of this fact and the fact that defendant has always borne a good reputation and the fact that he made settlement in full with the heirs and the fact that he will have to pay all costs of this proceeding, we think that a suspension from the practice of law for a period of 90 days is sufficient punishment.

It is therefore ordered that the defendant, R. LeRoy Williams, be suspended and debarred from the practice of law in the State of Louisiana for a period of 90 days, the period of suspension to begin on the day this decree becomes final. It is further ordered that the defendant, R. LeRoy Williams, pay all costs of this proceeding, as required by Section 11 of Article XIII of the Articles of Incorporation of the Louisiana State Bar Association (Original Rule XVIII, Section 8).

ROGERS, J., absent.